679 A.2d 606

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT AND
CROSS-APPELLANT, v. ERIC WOMACK, DEFENDANT-
APPELLANT AND CROSS-RESPONDENT.

Argued March 25, 1996—Decided July 25, 1996.

*Steven H. Gifis* argued the cause for appellant and cross-respondent (*Mr. Gifis,* attorney; *Mr. Gifis* and *Susan J. Abraham,* on the brief).

*Jane Deaterly Plaisted,* Assistant Prosecutor, argued the cause for respondent and cross-appellant (*Clifford J. Minor,* Essex County Prosecutor, attorney).

*Bennett A. Barlyn,* Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General, attorney).

The opinion of the Court was delivered by

HANDLER, J.

The Enforcement Bureau of the Division of Consumer Affairs, acting on a complaint it had received, sent an agent to defendant's business to investigate whether defendant was holding himself out as a medical doctor and practicing medicine without a license. Based on the evidence obtained by the investigator, the Attorney General filed a civil action seeking to enjoin defendant's activities and to impose a civil sanction. The Division of Consumer Affairs also filed a criminal complaint.

This appeal presents two issues: (1) whether a civil fine that specifically imposes a "penalty" and also assesses an amount for reimbursing the government for its costs constitutes punishment

under the Double Jeopardy Clauses of the New Jersey and the United States Constitutions; and (2) whether the failure of the prosecutor to disclose to the grand jury exculpatory information warrants dismissal of all or part of the criminal indictment.

I

On May 18, 1993, based on a complaint, an undercover investigator employed by the Enforcement Bureau of the Division of Consumer Affairs, visited the "Christian Health Institute and Wellness Center" to undertake an investigation of defendant Eric Womack. The agent professed to be a patient. After signing a disclaimer and an authorization form, and submitting urine, hair, and saliva samples, the agent was led into an examination room where he met defendant. The investigator informed defendant, who introduced himself as "an N.D.," a Naturopathic Doctor, that he had rectal bleeding.

Defendant examined and diagnosed the investigator. He poked the agent in the stomach with a pencil and simultaneously pushed down on the agent's outstretched arms. He shined a light in the investigator's eyes and electrically shocked his stomach. Using an instrument that looked and operated exactly like a ball point pen, defendant stung the agent's hand. From those tests, defendant concluded that the investigator had a clogged colon, weak kidneys, and aluminum in his body. Defendant warned the investigator that those conditions could lead to rectal cancer, and he advised him to schedule another visit. Defendant charged the investigator $300 for this visit.

During the follow-up visit, defendant advised the investigator that he needed to watch his diet if he hoped to unclog his colon and stop the rectal bleeding. Specifically, defendant recommended that the agent stop ingesting toxins and take certain vitamins and dietary supplements. The investigator purchased three of the $265 worth of recommended dietary products: "Temple Inner Cleanser," "Swedish Elixir," and "Agape Formula # 1."

Based on the investigator's report, the Attorney General's office filed a civil complaint in the Superior Court, Chancery Division, charging Eric Womack with the unlicensed practice of medicine in violation of the Medical Practices Act, *N.J.S.A.* 45:9–18 and –22. Two days after the Attorney General filed the civil complaint, the Division of Consumer Affairs filed a criminal complaint also charging defendant with the unauthorized practice of medicine based on the same conduct.

The Attorney General sought and obtained in the civil action an injunction against defendant, pursuant to *N.J.S.A.* 45:1–25, whereby defendant was permitted to continue operating the Wellness Center so long as he abided by certain restrictions and not practice medicine. On November 16, 1993, the civil action was settled through a consent order entered by the Superior Court, Chancery Division, and pursuant to which defendant agreed to abide by the conditions of the permanent injunction. Furthermore, defendant agreed to "pay to the State of New Jersey the sum of $5,000.00 in civil penalties and $3,554.07 in investigative costs, plus interest. . . ."

One week after the civil action was settled, the Essex County prosecutor took defendant's criminal case to a grand jury. The Enforcement Bureau investigator was the only witness called to testify, but his testimony was sufficient. On December 2, 1993, the grand jury returned an indictment charging defendant with one count of practicing medicine without a license in the third degree. *N.J.S.A.* 2C:21–20.

Prior to trial on the criminal indictment, defendant moved to dismiss the indictment. He asserted that the prosecution was violative of the Double Jeopardy Clause and he also alleged that the prosecutor's actions before the grand jury amounted to misconduct because the prosecutor misled the grand jury and failed to disclose certain information helpful to defendant. The Superior Court, Law Division agreed in part and dismissed the criminal indictment against defendant on double jeopardy grounds. The Appellate Division reversed finding no double jeopardy bar to the

prosecution, but it dismissed without prejudice part of the indictment because of the State's misconduct in failing to disclose to the grand jury information that directly refuted the investigator's testimony. Defendant appealed and the State cross-appealed from the Appellate Division's ruling. This Court granted the petition, 142 *N.J.* 515, 665 *A*.2d 1108 (1995), and the cross-petition, 143 *N.J.* 330, 670 *A*.2d 1070 (1996), for certification.

## II

The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution protects against three harms: reprosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. *North Carolina v. Pearce*, 395 *U.S.* 711, 717, 89 *S.Ct.* 2072, 2076, 23 *L.Ed.*2d 656, 664–65 (1969). Although the language of the New Jersey Constitution simply provides that "No person shall, after acquittal, be tried for the same offense," *N.J. Const.* art. I, ¶ 11, this protection is at a minimum co-extensive with that of the United States Constitution. *State v. Churchdale Leasing, Inc.,* 115 *N.J.* 83, 107–08, 557 *A*.2d 277 (1989).

The protection against multiple punishments may be implicated by a civil penalty following a criminal penalty if the civil sanction is levied in a separate proceeding, is based on the same conduct, and is punitive in nature. In weighing whether a civil fine is punitive, courts are directed to examine whether the fine can "fairly be characterized as remedial" or whether the fine serves "as a deterrent or retribution." *United States v. Halper*, 490 *U.S.* 435, 449, 109 *S.Ct.* 1892, 1902, 104 *L.Ed.*2d 487, 502 (1989). In making that determination, courts must examine the "purposes actually served by the sanction in question." *Id.* at 447 n. 7, 109 *S.Ct.* at 1901 n. 7, 104 *L.Ed.*2d at 501 n. 7. They must also consider its impact. *Doe v. Poritz*, 142 *N.J.* 1, 46, 662 *A*.2d 367 (1995).

■ The purposes served by the civil sanction can be determined directly or indirectly. Sometimes, the purposes of the civil sanction can be determined indirectly by simply examining the fine levied. A fine that is overwhelmingly disproportionate to the damages the defendant has caused and the costs the State has incurred in prosecuting the action can be understood only as serving the punitive goals of deterrence and retribution. *Halper, supra,* 490 *U.S.* at 449, 109 *S.Ct.* at 1902, 104 *L.Ed.*2d at 502; *Merin v. Maglaki,* 126 *N.J.* 430, 440–46, 599 *A.*2d 1256 (1992). In other circumstances, however, the purposes of the civil sanction may be understood by the language and terms of the sanction itself and the expressed or revealed intentions of the parties in imposing the fine. A civil sanction that is imposed for punitive purposes, understood by the parties as being punitive, and is clear on its face that it is punitive, will be considered to be punitive even when the fine is not grossly disproportionate to the damages caused. *See Poritz, supra,* 142 *N.J.* at 54, 662 *A.*2d 367 ("[T]he purpose and the intent of the civil sanction is the touchstone that determines the sanction's characterization as either remedial or punitive, rather than simply its impact."); *cf. Halper, supra,* 490 *U.S.* at 448 n. 8, 109 *S.Ct.* at 1902 n. 8, 104 *L.Ed.*2d at 501 n. 8 ("As the name indicates, punitive damages, available in civil cases, serve punitive goals."); *Poritz, supra,* 142 *N.J.* at 46, 662 *A.*2d 367 (finding that a law is held to impose punishment if either the legislature intended it to impose punishment or the impact of the legislative sanction is punitive).

■ A plain reading of the civil consent decree indicates that the civil fine may have been intended to be punitive. The civil fine assessed against Womack differentiated between penalties and costs. It included an amount of "civil penalties" and an amount of "investigative costs." A rational understanding of the phrase "civil penalties," when contrasted with the term "investigative costs," is that the sanction is an amount levied as a punitive fine separate from that necessary to reimburse the State.

Furthermore, the record indicates that the State understood, and therefore intended, the fine to be punitive. Although the prosecutor's concession at oral argument below that the fine was punitive is not dispositive of the issue, the concession indicates that, at the very least, the prosecutor understood the sanction to have a punitive purpose.

On the other hand, the amount of the fine indicates that the purpose may have been merely remedial. Its impact, as such, does not appear to be punitive. Certainly, had the civil penalty been imposed as a single and indivisible lump-sum fine, and not been divided into two parts labelled "civil penalty" and "investigative costs," upon an appropriate showing by the State, the *Halper* standard would support a finding that the fine was simply remedial in nature. As the State points out, the total amount assessed against defendant was less than the full costs of prosecuting the action. No further examination of the actual costs underlying the action is even necessary given the fact that the fine does not approach the grossly disproportionate level and is rationally related to the costs necessary to compensate the State. *Merin v. Maglaki, supra,* 126 *N.J.* at 444–45, 599 *A.2d* 1256. However, if the fine when levied was intended as a civil penalty with both remedial and punitive aspects, as the plain language indicates, then the fact that the State could have legitimately assessed an equal or greater amount as costs of prosecution is not material. A post-hoc explanation does not alter the nature or purpose of the fine when imposed.

Conclusive evidence of the purpose and intent of the parties at the time the fine was imposed cannot be gleaned from the current record. Although the civil sanction here is clearly not grossly disproportionate to the costs the State has incurred in prosecuting this action, the record reflects sufficient ambiguity on the intention of the parties in imposing the penalty to warrant remanding the action for a determination of whether the intention of the fine was punitive. *See Halper, supra,* 490 *U.S.* at 450, 109 *S.Ct.* at 1902–03, 104 *L.Ed.*2d at 502–03 (remanding to permit trial court to deter-

mine the size of a remedial civil sanction); *State v. Ciba–Geigy Corp.*, 253 *N.J.Super.* 51, 60, 600 *A.*2d 1230 (App.Div.1992) (same). If it is clear that the intent of the State and the court at the time the fine was imposed was to punish defendant, then double jeopardy would bar this criminal action.

■ The State argues that even if the civil fine was punitive there is no bar to this action because the Double Jeopardy Clause bars only civil prosecutions after criminal penalties, not criminal prosecutions after civil penalties. *Halper* itself was concerned only with a civil penalty following a criminal trial. The United States Supreme Court has not decided this issue. *See United States v. Ursery,* —— *U.S.* ——, —— n. 1, 116 *S.Ct.* 2135, 2140 n. 1, 135 *L.Ed.*2d 549, —— n. 1 (1996). We, however, add our voice to the weight of authorities in determining that the order of the prosecutions is not material. *See, e.g., United States v. Ursery,* 59 *F.*3d 568, 571–75 (6th Cir.1995), *rev'd on other grounds,* —— *U.S.* ——, 116 *S.Ct.* 2135, 135 *L.Ed.*2d 549 (1996); *United States v. Furlett,* 974 *F.*2d 839, 843 n. 2 (7th Cir.1992); *United States v. Sanchez–Escareno,* 950 *F.*2d 193, 200 (5th Cir.1991), *cert. denied,* 506 *U.S.* 841, 113 *S.Ct.* 123, 121 *L.Ed.*2d 78 (1992); *United States v. Walker,* 940 *F.*2d 442 (9th Cir.1991); *United States v. Bizzell,* 921 *F.*2d 263 (10th Cir.1990); *United States v. Mayers,* 897 *F.*2d 1126, 1127 (11th Cir.), *cert. denied,* 498 *U.S.* 865, 111 *S.Ct.* 178, 112 *L.Ed.*2d 142 (1990); *United States v. Marcus Schloss & Co.,* 724 *F.Supp.* 1123 (S.D.N.Y.1989).

■ In any event, even if the remand establishes that the penalty imposed on defendant was intended to be punitive, the State may still be able to avoid the double jeopardy bar. The State, if it can return the punitive portion of the civil fine, would no longer be barred from proceeding with the criminal action. Even if we were to determine that the $5,000 was a punitive fine, we could not now vacate the civil award because the civil action is not properly before us. Depending on the results of the remand, the State may seek to reconsider the $5,000 penalty imposed in the civil action. If the State is able to return to the trial court that entered the judgment and alter or amend the consent judg-

ment so as to eliminate the punitive portion of the civil penalty and if the State returns that portion to defendant, the double jeopardy bar to this action would be lifted.

 The rules governing civil practice provide a mechanism whereby a party may be relieved from a final judgment or order for "any ... reason justifying relief from the operation of the judgment or order." *R.* 4:50–1(f). A motion made pursuant to this rule must be made within a reasonable time, but no specific limit is placed on when it may be brought. *R.* 4:50–2. Although the boundaries of this doctrine are "as expansive as the need to achieve equity and justice," the application of this rule is limited to "exceptional situations." *Court Inv. Co. v. Perillo,* 48 *N.J.* 334, 341, 225 *A.*2d 352 (1966); *see also Housing Auth. v. Little,* 135 *N.J.* 274, 289, 639 *A.*2d 286 (1994) ("[T]he Rule is designed to provide relief from judgments in situations in which, were it not applied, a grave injustice would occur."). This may well constitute an exceptional circumstance, although that determination is left to the sound discretion of the trial court. *See Perillo, supra,* 48 *N.J.* at 341, 225 *A.*2d 352.

In sum, the language of the order imposing the fine on defendant indicates that the fine may have been intended to be punitive in nature. A remand is required to permit the trial court to determine whether the fine was punitive or remedial. However, no further exploration of the total investigative costs is necessary and therefore the State's motion to expand the record on appeal to support that assertion is denied.

If the civil fine is found to have a punitive purpose, and the State is unable to amend the civil judgment and return the punitive portion of that judgment to defendant, the State will be barred by the Double Jeopardy Clause from subjecting defendant to a criminal prosecution for this same conduct.

### III

 Because the State may be able to correct the double jeopardy problem, we take this opportunity to address the second

issue in this action—whether the indictment should be dismissed due to the prosecutor's actions before the grand jury in not disclosing certain information.

On November 23, 1993, the State sought to indict Womack for the unauthorized practice of medicine. The investigator was the sole witness before the grand jury. His testimony was inaccurate and incomplete. First, he testified that defendant prescribed vitamins, dietary supplements, and "things of that nature" to him. In fact, defendant did not issue him a prescription; rather, defendant recommended he purchase several over-the-counter items. Second, in response to a grand juror's question about whether defendant held any professional degrees or even a bachelor of arts degree, the investigator testified that to his knowledge defendant did not have any. Defendant not only has a bachelor's degree in religion, he has also received a Doctor of Divinity degree and a Doctor of Theology degree.

In addition to complaining about how the investigator misinformed the grand jury, defendant also complains that the prosecutor failed to present certain exculpatory information to the jurors. Defendant argues that the grand jury should have been informed that the agent was aware that defendant was not a medical doctor. The investigator signed an authorization form regarding "The Status Of Dr. Eric Womack, N.D." That form noted that defendant was a "naturopath" whose teachings were not "for the purpose of Diagnosing, mitigating, treating or caring for disease." Indeed, the form stated that diagnosis "of any kind for any disease" is not covered by defendant's practice. The agent was advised that he was "not to act on [Womack's] advice" until he was examined by a licensed medical doctor. Moreover, the forms stated that the service provided "is not a substitute for medical treatment" and is "not yet approved by the medical profession." The investigator agreed to "always seek medical advise [sic] for medical treatment."

We recently had the opportunity to determine when a prosecutor is required to submit exculpatory information to a grand jury.

In *State v. Hogan*, 144 *N.J.* 216, 676 *A.*2d 533 (1996), the Court was faced with a situation in which the sole witness to a crime recanted and then reinstated her account. The prosecutor refused defendant's request to inform the grand jury about the recantation. Noting that a grand jury " 'indictment should be disturbed only on the clearest and plainest ground,' " *id.* at 228, 676 *A.*2d 533 (quoting *State v. Perry*, 124 *N.J.* 128, 168, 590 *A.*2d 624 (1991)) (internal quotation omitted), the Court ruled that "the State may not deceive the grand jury or present its evidence in a way that is tantamount to telling the grand jury a 'half-truth.' " *Id.* at 236, 676 *A.*2d 533. Therefore, "evidence that is credible, material, and so clearly exculpatory as to induce a rational grand juror to conclude that the State has not made out a *prima facie* case against the accused" must be presented to the grand jury. *Ibid.* The evidence "must directly negate guilt and also be clearly exculpatory." *Id.* at 237, 676 *A.*2d 533. Thus, the only evidence that need be submitted is evidence that "squarely refutes an *element* of the crime in question" and is reliable within the context of the evidence. *Ibid.* In addition, the prosecutor must have actual knowledge of the clearly exculpatory evidence. *Id.* at 238, 676 *A.*2d 533. The recantation was held to be unreliable and not clearly exculpatory. *Id.* at 239–40, 676 *A.*2d 533.

Under these rigorous standards, much of the information complained of did not have to be submitted to the grand jury. There is no evidence that the prosecutor knew that Womack had two doctorate degrees and, therefore, we need not consider whether that information was clearly exculpatory and negates an element of the offense. Although there is evidence that the prosecutor knew Womack was a naturopath who was educated in Washington State, this information is not clearly exculpatory. Although imprecise, the investigator's testimony that defendant prescribed him dietary supplements is not clearly misleading; even suggesting taking vitamins and dietary supplements can, in certain circumstances, constitute the practice of medicine.

More difficult is the claim that the prosecutor was required to inform the grand jury that the investigator viewed documents

indicating defendant was not a medical doctor. Defendant was charged with one count of practicing medicine without a license in the third degree. The statute provides that one is guilty of the offense when the person does not possess a medical license and either "engages in that practice," *N.J.S.A.* 2C:21–20a, or "holds himself out to the public or any person as being eligible to engage in that practice." *N.J.S.A.* 2C:21–20c. Defendant was charged with both alternative portions of the statute.

The fact that defendant may have informed the investigator through the authorization forms that he was not a medical doctor does not refute any element of the offense of engaging in the practice of medicine. If defendant was engaging in the practice of medicine, the fact that he may have told the investigator that he was not a medical doctor is simply immaterial.

That evidence, however, is highly probative on the alternative basis of the charge—holding oneself out as a medical doctor. The evidence that defendant disclosed his professional status as a doctor of naturopathy and not a medical doctor flatly contradicts the principal element of that charge. Furthermore, the evidence, which was clearly known to the principal investigating agent, is properly considered to be within the knowledge of the prosecutor. *See Kyles v. Whitley*, —— U.S. ——, ——, 115 *S.Ct.* 1555, 1567–68, 131 *L.Ed.*2d 490, 508–09 (1995) (imputing knowledge to prosecutor of *Brady* material known by police officer); *State v. Landano*, 271 *N.J.Super.* 1, 37, 637 *A.*2d 1270 (App.Div.), *certif. denied*, 137 *N.J.* 164, 644 *A.*2d 612 (1994); *State v. Engel*, 249 *N.J.Super.* 336, 396, 592 *A.*2d 572 (App.Div.), *certif. denied*, 130 *N.J.* 393, 614 *A.*2d 616 (1991). Because the evidence was clearly exculpatory, highly reliable, and known by the prosecutor, that evidence should have been submitted to the grand jury. The failure to do so requires dismissal of that portion of the indictment.

## IV

In sum, defendant cannot currently be tried on the criminal indictment in this action because of the potential double jeopardy

bar derived from the civil penalty levied against him for the same conduct. If the State cures the double jeopardy bar, by either prevailing in the remanded proceeding or by revising the civil judgment and returning the punitive portion of civil fine, the criminal trial of defendant may proceed. However, the portion of the indictment charging defendant with holding himself out as a medical doctor is dismissed without prejudice because of the State's failure to present clearly exculpatory evidence to the grand jury.

The State's motion to expand the record is denied, the judgment of the Appellate Division is affirmed in part and reversed in part, and the action is remanded to the Law Division for proceedings consistent with this opinion.

*For affirmance in part; reversal in part; remandment—*
Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.